In the

# United States Court of Appeals

## For the Seventh Circuit

No. 17-2991

CITY OF CHICAGO,

*Plaintiff-Appellee,*

*v.*

JEFFERSON B. SESSIONS III, Attorney
General of the United States,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:17-cv-05720 — **Harry D. Leinenweber**, *Judge*.

ARGUED JANUARY 19, 2018 — DECIDED APRIL 19, 2018

Before BAUER, MANION, and ROVNER, *Circuit Judges*.

ROVNER, *Circuit Judge*. This appeal is from the grant of a
preliminary injunction in favor of the City of Chicago (the
"City") and against Jefferson Beauregard Sessions III, the At-
torney General of the United States, enjoining the enforce-
ment of two conditions imposed upon recipients of the Ed-
ward Byrne Memorial Justice Assistance Grant Program (the
"Byrne JAG program"). See 34 U.S.C. § 10151 (formerly 42

U.S.C. § 3750). The Byrne JAG grant, named after a fallen New York City police officer, allocates substantial funds annually to provide for the needs of state and local law enforcement, including personnel, equipment, training, and other uses identified by those entities. The Attorney General tied receipt of the funds to the grant recipient's compliance with three conditions which the City argued were unlawful and unconstitutional. The district court agreed with the City as to two of the three conditions—the "notice" condition mandating advance notice to federal authorities of the release date of persons in state or local custody who are believed to be aliens, and the "access" condition which required the local correctional facility to ensure agents access to such facilities and meet with those persons. Compliance with those conditions in order to receive the funding awarded under the Byrne JAG grant would require the allocation of state and local resources, including personnel. The district court granted the preliminary injunction as to those two conditions, applying it nationwide. The court subsequently denied the Attorney General's motion to stay the nationwide scope of the injunction, and this court denied the stay on appeal. The Attorney General now appeals that preliminary injunction.

Our role in this case is not to assess the optimal immigration policies for our country; that is not before us today. Rather, the issue before us strikes at one of the bedrock principles of our nation, the protection of which transcends political party affiliation and rests at the heart of our system of government—the separation of powers.

The founders of our country well understood that the concentration of power threatens individual liberty and es-

tablished a bulwark against such tyranny by creating a separation of powers among the branches of government. If the Executive Branch can determine policy, and then use the power of the purse to mandate compliance with that policy by the state and local governments, all without the authorization or even acquiescence of elected legislators, that check against tyranny is forsaken. The Attorney General in this case used the sword of federal funding to conscript state and local authorities to aid in federal civil immigration enforcement. But the power of the purse rests with Congress, which authorized the federal funds at issue and did not impose any immigration enforcement conditions on the receipt of such funds. In fact, Congress repeatedly refused to approve of measures that would tie funding to state and local immigration policies. Nor, as we will discuss, did Congress authorize the Attorney General to impose such conditions. It falls to us, the judiciary, as the remaining branch of the government, to act as a check on such usurpation of power. We are a country that jealously guards the separation of powers, and we must be ever-vigilant in that endeavor.

## I.

The path to this case began in 2006, which was both the year that the City enacted its Welcoming City ordinance, and the year that the federal government first established the Byrne JAG program. For many years, the two coexisted without conflict. In the past few years, numerous pieces of legislation were introduced in the House and Senate seeking to condition federal funding on compliance with 8 U.S.C. § 1373—which was intended to address "sanctuary cities" and prohibit federal, state or local government officials or entities from restricting the exchange of information with the

immigration authorities regarding citizenship or immigration status. None of those efforts were passed by Congress. See, e.g., Stop Dangerous Sanctuary Cities Act, H.R. 5654, 114th Cong. § 4 (2016); Stop Dangerous Sanctuary Cities Act, S. 3100, 114th Cong. § 4 (2016); Enforce the Law for Sanctuary Cities Act, H.R. 3009, 114th Cong. § 3 (2015); Mobilizing Against Sanctuary Cities Act, H.R. 3002, 114th Cong. § 2 (2015); Stop Sanctuary Policies and Protect Americans Act, S. 2146, 114th Cong. § 3(a) (2015); Stop Sanctuary Cities Act, S. 1814, 114th Cong. § 2 (2015) (all available at https://www.congress.gov). see also Annie Lai & Christopher N. Lasch, *Crimmigration Resistance and the Case of Sanctuary City Defunding*, 57 Santa Clara L. Rev. 539, 553 n. 87 (2017) (listing eight pieces of legislation introduced during that time, all of which were unsuccessful).

Determined to forge a different path in immigration enforcement, the President on January 25, 2017 issued an Executive Order directing the Attorney General and the Department of Homeland Security (DHS) Secretary, in their discretion and to the extent consistent with law, to ensure that sanctuary jurisdictions are not eligible to receive Federal grants except as deemed necessary for law enforcement purposes by the Attorney General or the Secretary. Exec. Order No. 13,768, 82 Fed. Reg. 8799 at § 9(a) (Jan. 25, 2017). That Executive Order was challenged in court and preliminarily enjoined by a district court on April 25, 2017—and subsequently permanently enjoined. *County of Santa Clara v. Trump*, 250 F. Supp. 3d 497 (N.D. Cal. 2017); *County of Santa Clara v. Trump*, 275 F. Supp. 3d 1196 (N.D. Cal. 2017). Shortly thereafter—in the face of the failure of Congress to pass such restrictions and the issues with the legality of the Executive Order—on July 25, 2017, the Attorney General pursued yet

another path to that goal and issued the conditions for recipients of the Byrne JAG funds that are challenged here.

The Byrne JAG program is the primary provider of federal criminal justice funding to state and local governments. The funds have been used to meet a wide range of needs for those law enforcement entities, including funding the acquisition of body cameras and police cruisers, and support for community programs aimed at reducing violence. The City, which challenges the new conditions imposed, had targeted the fiscal year 2017 funds for several purposes including expansion of the use of ShotSpotter technology to allow officers to quickly identify the location of shooting incidents and deploy a more precise response. Under the new provisions imposed by the Attorney General, state and local governing authorities who were awarded grants under the Byrne JAG program could not receive any of the funds unless they complied with the new conditions.

Specifically, the Attorney General imposed "notice," "access," and "compliance" conditions, on Byrne JAG grant recipients, only the first two of which are at issue in this appeal. The "notice" and "access" conditions require that for local governments, throughout the period for the award:

> A. A local ordinance, -rule, -regulation, -policy, or -practice (or an applicable State statute, -rule, -regulation, -policy, or -practice) must be in place that is designed to ensure that agents of the United States acting under color of federal law in fact are given access [to] a local-government (or local-government-contracted) correctional facility for the purpose of permitting such agents to meet with individuals who are (or are believed by such agents to be) aliens and to inquire as

to such individuals' right to be or remain in the United States.

B. A local ordinance, -rule, -regulation, -policy, or -practice (or an applicable State statute, -rule, -regulation, -policy, or -practice) must be in place that is designed to ensure that, when a local-government (or local-government-contracted) correctional facility receives from DHS a formal written request authorized by the Immigration and Nationality Act that seeks advance notice of the scheduled release date and time for a particular alien in such facility, then such facility will honor such request and—as early as practicable (see "Rules of Construction" incorporated by para. 4.B. of this condition)—provide the requested notice to DHS.

OJP Form 4000/2 (Rev. 4-88); https://www.bja.gov/Jag/pdfs/SampleAwardDocument-FY2017JAG-Local.pdf at 19 (last visited 03-20-18).

It further provides that "[n]othing in this condition shall be understood to authorize or require … any entity or individual to maintain (or detain) any individual in custody beyond the date and time the individual would have been released in the absence of this condition." *Id*. at 18. Identical provisions apply when the states are the grant recipients rather than local governments. *Id*. Under the notice condition, grant recipients were initially required to provide 48 hours' advance notice to the DHS as to the scheduled release date and time of any individuals in the jurisdiction's custody suspected of immigration violations. When the City sued and sought a preliminary injunction, it argued in part that the requirement was impossible to implement in Chicago which operated only temporary lock-up facilities and held

the vast majority of persons for less than 24 hours, and that holding them for a longer period in order to comply would violate the Fourth Amendment of the United States Constitution. The Attorney General subsequently modified the notice condition, requiring that advance notice be provided as early as practicable. The access condition required the local authorities to provide immigration agents with access to the local detention facilities and to the individuals detained there to question such individuals.

Those conditions were inconsistent with the provisions in the Welcoming City Ordinance, and the City challenged the imposition of those conditions by the Attorney General. The Welcoming City Ordinance reflects the City's determination that, as a City in which one out of five of its residents is an immigrant, "the cooperation of all persons, both documented citizens and those without documentation status, is essential to achieve the City's goals of protecting life and property, preventing crime and resolving problems." Chicago Municipal Code, Welcoming City Ordinance, § 2-173-005 "Purpose and Intent." The City recognized that the maintenance of public order and safety required the cooperation of witnesses and victims, whether documented or not, and the cooperation of Chicago's immigrant communities. *Id*. Finally, the City concluded that immigrant community members, whether or not documented, should be treated with respect and dignity by all City employees. *Id*. Toward that end, the City set forth some standards for the treatment of persons within its jurisdiction, which included prohibitions on requesting or disclosing information as to immigration status, and on detaining persons based on a belief as to that status or based on immigration detainers when such immigration detainer is based solely on a violation of civil immigration

law. *Id*. at § 2-173-020, -030, -042. It also provides in § 2-173-042 that unless acting pursuant to law enforcement purposes unrelated to the enforcement of civil immigration law, no agency or agent shall permit Immigrations and Customs Enforcement (ICE) agents access to a person being detained or permit the use of agency facilities for investigative interviews, nor can an agency or agent while on duty expend time responding to ICE inquiries or communicating with ICE as to a person's custody status or release date. The Ordinance explicitly clarifies that those provisions in § 2-173-042 do not apply when the subject of the investigation "has an outstanding criminal warrant, … has been convicted of a felony, … is a defendant … where … a felony charge is pending, … or has been identified as a known gang member either in a law enforcement agency's database or by his or her own admission." *Id*. at § 2-173-042(c).

The City therefore could not comply, consistent with its Ordinance, with the conditions imposed by the Attorney General on those seeking funds under the Byrne JAG program, and filed this suit alleging that the conditions were unlawful under the statute and unconstitutional as a violation of separation of powers principles. In a thorough and well-reasoned opinion, Judge Leinenweber in the district court granted the City's motion for a preliminary injunction as to the notice and access conditions, but denied it as to the compliance condition which is not challenged in this appeal and of which we express no opinion. The district court noted that nothing in the Byrne JAG statute granted express authority to the Attorney General to impose the notice and access conditions, and rejected the Attorney General's claim that a provision in a different subsection, 34 U.S.C. § 10102, could be interpreted to allow such authority. The court fur-

ther concluded that a nationwide preliminary injunction was required to provide full relief in this case.

## II.

Underlying this case are the sometimes-clashing interests between those of the federal government in enforcing its laws and those of the state or local government in policing and protecting its communities. Here, the federal executive branch, in the person of the Attorney General, has concluded that its interests will be best served by harnessing the local authorities to identify and to make accessible persons in their custody who are potentially in the country unlawfully, so as to facilitate efficient civil immigration enforcement. State and local law enforcement authorities, however, are concerned with maximizing the safety and security of their own communities. For some communities, those goals might be maximized by cooperating with the federal immigration authorities and assisting them in identifying and seizing undocumented individuals in their communities.

Other communities, such as the City in this case, however, have determined that their local law enforcement efforts are handcuffed by such unbounded cooperation with immigration enforcement. They have concluded that persons who are here unlawfully—or who have friends or family members here unlawfully—might avoid contacting local police to report crimes as a witness or a victim if they fear that reporting will bring the scrutiny of the federal immigration authorities to their home.[1] In the case of domestic violence or

---

[1] That fear of the reach of immigration authorities would not be unfounded. According to the Fiscal Year 2017 ICE Enforcement and Removal Operations Report, approximately 11% of the arrested alien popu-

crimes of that nature, the reluctance to report that is endemic to such offenses could be magnified in communities where reporting could turn a misdemeanor into a deportation. And the failure to obtain that victim and witness cooperation could both hinder law enforcement efforts and allow criminals to freely target communities with a large undocumented population, knowing that their crimes will be less likely to be reported. Those competing interests, between the Attorney General in pursuing civil immigration compliance and the state and local law enforcement authorities in ensuring the safety and security of their communities, are placed into direct conflict because the Attorney General in requiring these conditions forces the states and localities to devote resources to achieving the federal immigration goals or forfeit the funds. State and local law enforcement authorities are thus placed in the unwinnable position of either losing needed funding for law enforcement, or forgoing the relationships with the immigrant communities that they deem necessary for efficient law enforcement

Although the City uses the term Welcoming City in its ordinance, localities which have concluded that cooperation in federal civil immigration efforts is counterproductive or simply offensive are often labeled "sanctuary" cities or states, but that term is commonly misunderstood. The term

---

lation had no known criminal convictions or charges, reflecting ICE's avowed goal of expanding its efforts "to address all illegal aliens encountered in the course of its operations." https://www.ice.gov/sites/default/files/documents/Report/2017/iceEndOfYearFY2017.pdf at 3-4 (last visited 03-20-2018). Of those with criminal convictions, 25% were convictions for immigration violations or non-DUI traffic offenses. *Id.* at 4 Table 2.

signifies a place of refuge or protection, *see e.g* Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/sanctuary, and is used for example to describe a house of worship, into which, if a person flees, law enforcement authorities commonly will not enter to forcibly remove the person. That definition has no correlation to the so-called sanctuary cities at issue here. The City, like other "welcoming" or "sanctuary" cities or states, does not interfere in any way with the federal government's lawful pursuit of its civil immigration activities, and presence in such localities will not immunize anyone to the reach of the federal government. Accord *City of Philadelphia v. Sessions*, 280 F. Supp. 3d 579, 591, 602 (E.D. Pa. 2017). The federal government can and does freely operate in "sanctuary" localities.

And the level of refuge provided by sanctuary cities is not unbounded. For instance, the City cooperates with immigration enforcement authorities for persons who pose a threat to public safety, exempting from the Ordinance investigations involving persons for whom there is an outstanding criminal (as opposed to civil) warrant, persons convicted of or charged with a felony, or persons who are known gang members. Thus, for the persons most likely to present a threat to the community, City law enforcement authorities will cooperate with ICE officials even in "sanctuary" cities. The decision to coordinate in such circumstances, and to refuse such coordination where the threat posed by the individual is lesser, reflects the decision by the state and local authorities as how best to further the law enforcement objectives of their communities with the resources at their disposal.

Moreover, as to the persons who have proven to be a threat to society such as those in longer-term incarceration, other programs already in place would alert ICE to potential immigration issues. For instance, the "Secure Communities" program was first instituted in 2008 and reactivated in 2017 in order to carry out ICE's enforcement priorities regarding persons in the custody of another law enforcement agency. See Official Website of DHS, https://www.ice.gov/secure-communities at 1. Local law enforcement agencies as a matter of routine submit fingerprints of individuals in their custody to the FBI for criminal background checks and, under Secure Communities, the FBI automatically forwards that information to the DHS to check the prints against its immigration databases. *Id*.; *City of Philadelphia*, 280 F. Supp. 3d at 633. According to the DHS, "ICE completed full implementation of Secure Communities to all 3,181 jurisdictions within 50 states, the District of Columbia, and five U.S. territories on January 23, 2013." See Official Website of DHS, https://www.ice.gov/secure-communities at 1. With that ability to identify undocumented individuals, at least as to those serving prison sentences for whom the pressure of time and the possibility of a quick release are not issues, ICE could procure a judicial warrant and obtain a transfer of custody.

## III.

To establish its entitlement to preliminary relief, the City must demonstrate that "(1) without such relief, [it] will suffer irreparable harm before [its] claim is finally resolved; (2) [it] has no adequate remedy at law; and (3) [it] has some likelihood of success on the merits." *Harlan v. Scholz*, 866 F.3d 754, 758 (7th Cir. 2017). If that burden is met, the court must weigh the harm that the plaintiff will suffer absent an

injunction against the harm to the defendant from an injunction, and consider whether an injunction is in the public interest. *Id.*; *Higher Soc'y of Indiana v. Tippecanoe Cty., Indiana*, 858 F.3d 1113, 1116 (7th Cir. 2017). The district court weighed all of those factors and granted the preliminary injunction as to the notice and access conditions, denying it as to the compliance condition. On this appeal from the grant of the preliminary injunction as to those two conditions, we ask only whether the district court abused its discretion. *Harlan*, 866 F.3d at 758. In the absence of any clear error of fact or law, we accord great deference to the district court's weighing of the relevant factors. *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 896 (7th Cir. 2001).

With respect to the preliminary injunction factors, the Attorney General challenges only the district court's conclusion as to the likelihood of success on the merits, and the scope of the preliminary injunction. The district court held that the Attorney General lacked the statutory authority to impose the notice and access conditions, and consequently the efforts to impose them violated the separation of powers doctrine and were *ultra vires*. Dist. Ct. at 19.

In considering on appeal the likelihood of success on the merits, it is necessary to focus narrowly on the dispositive question and to avoid the invitation of the parties to weigh in on broader policy considerations. For instance, the Attorney General repeatedly characterizes the issue as whether localities can be allowed to thwart federal law enforcement. That is a red herring. First, nothing in this case involves any affirmative *interference* with federal law enforcement at all, nor is there any interference whatsoever with federal immigration authorities. The only conduct at issue here is the re-

fusal of the local law enforcement to aid in civil immigration enforcement through informing the federal authorities when persons are in their custody and providing access to those persons at the local law enforcement facility. Some localities might choose to cooperate with federal immigration efforts, and others may see such cooperation as impeding the community relationships necessary to identify and solve crimes. The choice as to how to devote law enforcement resources—including whether or not to use such resources to aid in federal immigration efforts—would traditionally be one left to state and local authorities. Whether the conscription of local and state law enforcement for federal immigration enforcement through the sword of withholding federal funds presents other Constitutional concerns is not before us. See generally *Nat. Federation of Indep. Bus. v. Sebelius*, 567 U.S. 519, 580 (2012) (noting, for example, that the Constitution may be implicated where "'the financial inducement offered by Congress' was 'so coercive as to pass the point at which pressure turns into compulsion'"); *Printz v. United States*, 521 U.S. 898 (1997); *South Dakota v. Dole*, 483 U.S. 203 (1987). This appeal turns on the more fundamental question of whether the Attorney General possessed the authority to impose the conditions at all.

The Attorney General also complains that "[n]othing in the statute supports the counterintuitive conclusion that applicants can insist on their entitlement to federal law enforcement grants even as they refuse to provide the most basic cooperation in immigration enforcement, which the Attorney General has identified as a federal priority." Appellant's Brief at 17. In fact, throughout the briefs in this case, the Attorney General is incredulous that localities receiving federal funds can complain about conditions attached to the

distribution of those funds. But that repeated mantra evinces a disturbing disregard for the separation of powers. The power of the purse does not belong to the Executive Branch. It rests in the Legislative Branch. Congress may, of course, delegate such authority to the Executive Branch, and indeed the case today turns on whether it did so here, but the Executive Branch does not otherwise have the inherent authority as to the grant at issue here to condition the payment of such federal funds on adherence to its political priorities.

In fact, the Attorney General otherwise acknowledges that limitation when addressing the legal issues here. The Attorney General does not claim to possess inherent executive authority to impose the grant conditions, and instead recognizes that the authority must originate from Congress.

We turn, then, to that core issue in the Attorney General's challenge to the preliminary injunction—whether Congress granted to the Assistant Attorney General the unbounded authority to impose his or her own conditions on the release of the Byrne JAG funds. The Byrne JAG statute itself grants the Attorney General explicit authority to carry out specific actions under the Act in 34 U.S.C. §§ 10152–10158, including: to make grants "in accordance with the formula established under section 10156," § 10152(a)(1); to develop a program assessment component in coordination with the National Institute of Justice, and to waive that requirement if the program is not of sufficient size to justify it, § 10152(c); to certify that extraordinary and exigent circumstances exist that would allow the use of the funds for purposes that fall within the prohibited use categories, § 10152(d)(2); to grant renewals and extensions beyond the four year period, § 10152(f); to determine the form of the application and the

certification, § 10153(a); to provide technical assistance to states and local governments, § 10153(b); to approve or disapprove applications after affording the applicant reasonable notice of deficiencies and the opportunity for correction and reconsideration, § 10154; to issue rules to carry out this part, § 10155; to allocate funds pursuant to the statutory formula, § 10156; to certify that a unit of local government bears disparate costs as defined in the statute to allow for disparate allocations under that formula, § 10156(d)(4); to reallocate funds not used by the state, § 10156(f); to reserve not more than $20,000,000 for use by the National Institute of Justice and for antiterrorism programs, § 10157(a); to reserve not more than 5 percent, to be granted to 1 or more states or local governmental units, to address precipitous or extraordinary increases in crime or in types of crimes, or to mitigate significant programmatic harm resulting from the operation of the formula for allocating funds, § 10157(b); and to reduce the amounts paid if a state or local unit of government fails to expend the funds within the grant period and fails to repay it, § 10158. None of those provisions grant the Attorney General the authority to impose conditions that require states or local governments to assist in immigration enforcement, nor to deny funds to states or local governments for the failure to comply with those conditions. The Attorney General does not argue otherwise; he does not argue that any provision in the Byrne JAG statute authorizes the imposition of the conditions.

Instead, in his appeal, the Attorney General places all his purported authorization in one statutory basket, pointing to 34 U.S.C. § 10102(a)(6) as authorizing the Assistant Attorney General to impose these—and indeed any—conditions on grant recipients. Section 10102 sets forth the duties and func-

tions of the Assistant Attorney General for the Office of Justice Programs and provides:

> § 10102. Duties and functions of Assistant Attorney General
>
> (a) Specific, general and delegated powers
>
> The Assistant Attorney General shall—
>
> (1) publish and disseminate information on the conditions and progress of the criminal justice systems;
>
> (2) maintain liaison with the executive and judicial branches of the Federal and State governments in matters relating to criminal justice;
>
> (3) provide information to the President, the Congress, the judiciary, State and local governments, and the general public relating to criminal justice;
>
> (4) maintain liaison with public and private educational and research institutions, State and local governments, and governments of other nations relating to criminal justice;
>
> (5) coordinate and provide staff support to coordinate the activities of the Office and the Bureau of Justice Assistance, the National Institute of Justice, the Bureau of Justice Statistics, the Office for Victims of Crime, and the Office of Juvenile Justice and Delinquency Prevention; and
>
> (6) exercise such other powers and functions as may be vested in the Assistant Attorney General pursuant to this chapter or by delegation of the Attorney General, **including placing special conditions on all grants, and determining priority purposes for formula grants.**

34 U.S.C.A. § 10102 [emphasis added]. The Attorney General contends that the bolded language constitutes a grant of authority to the Assistant Attorney General to impose any conditions he or she sees fit, and applies to the Byrne JAG grants as well even though the grants are in a different subchapter.

It is well-established that the plain language of a statute is "the best indicator of Congress's intent," and that "'[a]bsent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive.'" *Fed. Nat'l Mortg. Ass'n. v. City of Chicago*, 874 F.3d 959, 962 (7th Cir. 2017), quoting *Lewis v. Epic Sys. Corp.*, 823 F.3d 1147, 1152 (7th Cir. 2016); *Puerto Rico v. Franklin California Tax-Free Trust*, 136 S. Ct. 1938, 1946 (2016). The Attorney General's interpretation is contrary to the plain meaning of the statutory language. The word "including" by definition is used to designate that a person or thing is part of a particular group. See e.g. Oxford English Dictionary, Third Ed., Sept. 2016, www.oed.com (defining "including" as "[u]sed to indicate that the specified person or thing is part of the whole group or category being considered: with the inclusion of") (last visited 03-12-18.) In this section, its plain meaning is to set forth a subcategory of the types of powers and functions that the Assistant Attorney General may exercise when vested in the Assistant Attorney General either by the terms of this chapter or by delegation of the Attorney General.

The inescapable problem here is that the Attorney General does not even claim that the power exercised here is authorized anywhere in the chapter, nor that the Attorney General possesses that authority and therefore can delegate

it to the Assistant Attorney General. In fact, as set forth above, the Byrne JAG provisions set forth the duties of the Attorney General and do not provide any open-ended authority to impose additional conditions. See 34 U.S.C. §§ 10152–10157. Therefore, the Attorney General's argument is that the "including" clause itself is a stand-alone grant of authority to the Assistant Attorney General to attach any conditions to any grants in that subchapter or other subchapters even though that authority is not otherwise provided in the chapter and is not possessed by the Attorney General. Because that interpretation is so obviously belied by the plain meaning of the word "including," the Attorney General's position is untenable.[2]

That *alone* is sufficient to end the inquiry and affirm the determination of a likelihood of success on the merits. But we note that our plain reading of the statute is also consistent with the structure of § 10102 and of the Byrne JAG statute.

First, § 10102(a)(6) would be an unlikely place for Congress to place a power as broad as the one the Attorney General asserts. The preceding "powers" in the list, §§ 10102(a)(1)–(5), address the communication and coordination duties of the Assistant Attorney General. The sixth provision, § 10102(a)(6), is a catch-all provision, simply recog-

---

[2] The Attorney General's argument might fail for an additional reason, that the term "special conditions" is a term of art referring to conditions for high-risk grantees with difficulty adhering to grant requirements, and cannot be read as an unbounded authority to impose "any" conditions generally. See *City of Philadelphia*, 280 F. Supp. 3d at 617. In light of our analysis of the clause as a whole, we need not address that argument.

nizing that the Assistant Attorney General can also exercise
such other powers and functions as may be vested through
other sources—either in that Chapter or by delegation from
the Attorney General. The "including" phrase is tacked on to
that. A clause in a catch-all provision at the end of a list of
explicit powers would be an odd place indeed to put a
sweeping power to impose *any* conditions on *any* grants—a
power much more significant than all of the duties and
powers that precede it in the listing, and a power granted to
the Assistant Attorney General that was not granted to the
Attorney General. The structure of § 10102 therefore is con-
sistent with the plain language interpretation—that the "in-
cluding" clause merely exemplified the type of other powers
that the Assistant Attorney General may possess by delega-
tion elsewhere.

Moreover, an interpretation such as is argued by the At-
torney General, that would allow the Assistant Attorney
General to impose any conditions on the grants at will, is in-
consistent with the goal of the statute to support the needs of
law enforcement while providing flexibility to state and local
governments. And the notion of the broad grant of authority
to impose any conditions on grant recipients is at odds with
the nature of the Byrne JAG grant, which is a formula grant
rather than a discretionary grant. As a formula grant, it is
structured so that the funds are allocated based on a careful-
ly defined calculation which determines a minimum base
allocation which can be enhanced based on the state's share
of the national population and the state's share of the coun-
try's violent crime statistics. Once calculated, 60 percent of
the state's allocation is awarded to the state and 40 percent
to the eligible local government units. See 34 U.S.C. § 10156;
Edward Byrne Memorial Justice Assistance Grant (JAG)

Program Fact Sheet, https://www.bja.gov/programs/JAG-Fact-Sheet.pdf (last visited 03-07-18). The Attorney General is authorized under the statute to make grants "in accordance with the formula established under section 10156." 34 U.S.C. § 10152(a). If Congress sought to provide an agency the ability to exercise its judgment in the selection of the grantees, it would have made sense for it to do so by employing the discretionary grant model rather than the formula grant structure used here. Located in a different subpart of the same statute, the provision for discretionary grants imbues the Director (who reports to the Assistant Attorney General) with the authority to award funds on terms and conditions that the Director determines to be consistent with that subpart. See 34 U.S.C. § 10142.

The ability of the Attorney General to depart from the distribution mandated by the formula is strictly circumscribed. For instance, of the total amount available in a given fiscal year, the Attorney General is authorized to reserve "not more than 5 percent, to be granted to 1 or more States or units of local government" for one or more of the allowed statutory purposes, "pursuant to his determination that the same is necessary (1) to combat, address, or otherwise respond to precipitous or extraordinary increases in crime, or in a type or types of crime; or (2) to prevent, compensate for, or mitigate significant programmatic harm resulting from operation of the formula … ." 34 U.S.C. § 10157(b). Moreover, the Attorney General is authorized by other statutes to reduce the funding in certain circumstances, but even then the amount of the reduction is set by statute. For example, the Sex Offender Registration and Notification Act mandates a 10 percent reduction in JAG funding if a state fails to substantially implement its provisions. 34 U.S.C. § 20927(a).

And the Prison Rape Elimination Act of 2003 stipulates that a state that does not certify full compliance with its national standards can forfeit 5 percent of JAG funds unless it certifies that no less than 5 percent of such funds will be used solely to achieve compliance. 34 U.S.C. § 30307(e)(2)(A).

Therefore, the statute precisely describes the formula through which funds should be distributed to states and local governments, and imposes precise limits on the extent to which the Attorney General can deviate from that distribution. Against that backdrop, it is inconceivable that Congress would have anticipated that the Assistant Attorney General could abrogate the entire distribution scheme and deny all funds to states and localities that would qualify under the Byrne JAG statutory provisions, based on the Assistant Attorney General's decision to impose his or her own conditions—the putative authority for which is provided in a different statute. Indeed, the statute which purportedly grants that power to the Assistant Attorney General was passed in the same Omnibus Act as the Byrne JAG statute, yet nothing in the Byrne JAG statute cross-references that alleged authority or even hints that the tightly-circumscribed structure of the Byrne JAG grants can be upended by some unbounded authority in § 10102 of the Assistant Attorney General to impose new conditions.

Finally, Congress knew how to grant such authority, and explicitly did so in another statute within the same Act that added the "including" language. *See generally* Violence Against Women and Department of Justice Reauthorization Act of 2005, H.R. 3402, Pub. L. No. 109-162, 119 Stat. 2960 (2006). The Violence Against Women Act provided that "[i]n disbursing grants under this subchapter, the Attorney Gen-

eral may impose reasonable conditions on grant awards to ensure that the States meet statutory, regulatory, and other program requirements." 34 U.S.C. § 10446(e)(3). In contrast, as set forth above, the Byrne JAG statute provides the Attorney General authority over a carefully delineated list of actions, with no such broad authority to impose reasonable conditions. If Congress had wanted to vest such authority in the Attorney General regarding the Byrne JAG grant, one would expect it to include explicit language in the grant statute itself, as it did in the Violence Against Women Act. The Attorney General's argument that such sweeping authority over the major source of funding for law enforcement agencies nationwide was provided to the Assistant Attorney General by merely adding a clause to a sentence in a list of otherwise-ministerial powers defies reason. The authority to impose any conditions desired to the Byrne JAG grant—and by the Attorney General's reasoning to all other grants under the Assistant Attorney General's domain—is a tremendous power of widespread impact, and is not the type of authority that would be hidden in a clause without any explanation, and without any reference or acknowledgment of that authority in the statute that actually contains the grant itself. *See e.g. Gonzales v. Oregon*, 546 U.S. 243, 262 (2006) (rejecting the Attorney General's argument that the power to deregister a physician in the public interest included the power to criminalize the actions of registered physicians when they engage in conduct he deems illegitimate, and holding that "[i]t would be anomalous for Congress to have so painstakingly described the Attorney General's limited authority to deregister a single physician or schedule a single drug, but to have given him, just by implication, authority to declare an entire class of activity outside 'the course of

professional practice,' and therefore a criminal violation"); *Utility Air Regulatory Group v. E.P.A.*, 134 S. Ct. 2427, 2444 (2014) (noting that the Court would expect Congress to speak clearly if it wished "to assign to an agency decisions of vast 'economic and political significance.'"), quoting *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000); *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981) ("if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously.") As the Supreme Court has repeatedly held, "'Congress … does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes.'" *Gonzales*, 546 U.S. at 267, quoting *Whitman v. American Trucking Assns., Inc.*, 531 U.S. 457, 468 (2001).

Accordingly, the district court did not err in determining that the City established a likelihood of success on the merits of its contention that the Attorney General lacked the authority to impose the notice and access conditions on receipt of the Byrne JAG grants. The Attorney General raises no challenge to the district court's application of other preliminary injunction factors, and therefore, the district court properly determined that preliminary relief was warranted.

## IV.

The Attorney General additionally challenges the scope of the preliminary injunction, arguing that the district court erred in granting nationwide relief, rather than more narrowly limiting the geographic scope of the injunction to the City of Chicago. We are cognizant of the possible hazards of the use of nationwide injunctions, as was the district court in this case. Commentators have cautioned that the use of na-

tionwide injunctions can stymie the development of the legal issues through the court system as a whole. *See e.g.* Samuel L. Bray, *Multiple Chancellors: Reforming the National Injunction,* 131 Harvard L. Rev. 417 (2017); Zayn Siddique, *Nationwide Injunctions*, 117 Colum. L. Rev. 2095 (2017); *but see* Spencer E. Amdur and David Hausman, *Nationwide Injunctions and Nationwide Harm*, 131 Harvard L. Rev. F. 49 (2017) When relief is limited in geographic scope, multiple cases may be filed in numerous jurisdictions, and the reviewing courts may therefore gain a wider range of perspectives and the opportunity to explore the impact of those legal issues in other factual contexts. That process may be truncated, however, if a district court issues a nationwide injunction.

Moreover, where nationwide injunctions are possible, courts must be cognizant of the potential for forum shopping by plaintiffs. Commentators have documented this phenomenon over the past decades, which transcends administrations and political parties. For instance, under the Obama administration, such injunctions stymied many of the President's policies, with five nationwide injunctions issued by Texas district courts in just over a year. See Bray, *Multiple Chancellors*, 131 Harvard L. Rev. at 458–59 and cases cited therein. At that time, then-Senator and now-Attorney General Sessions characterized the upholding of one such nationwide preliminary injunction as "a victory for the American people and for the rule of law." Press Release, Sen. Jeff Sessions III, June 23, 2016. Now, many who advocated for broad injunctions in those Obama-era cases are opposing them.

In fact, support for or opposition to nationwide injunctions would likely vary with the nature of the controversial

issue at stake and the identity of the persons in power. For example, if a different Administration concluded that certain weapons were a threat to public safety, and conditioned receipt of Byrne JAG funds on a state or locality adopting a policy banning assault weapons, it is quite likely that the sides would reverse once again as to the need for and appropriateness of nationwide injunctions. Although the pursuit of nationwide injunctions may be influenced by shifting political motivations, that neither means that nationwide injunctions themselves are inherently evil, nor that such injunctions should never be issued. Instead, courts in determining the proper scope of injunctive relief, must be cognizant of the potential for such injunctions to have a profound impact on national policy.

In light of those concerns with limiting the input of other courts and with forum shopping, nationwide injunctions should be utilized only in rare circumstances. That said, nationwide injunctions nevertheless play an important and proper role in some circumstances. Certainly, for issues of widespread national impact, a nationwide injunction can be beneficial in terms of efficiency and certainty in the law, and more importantly, in the avoidance of irreparable harm and in furtherance of the public interest.

In fact, the Supreme Court in *Trump v. Intern. Refugee Assistance Project*, 137 S. Ct. 2080 (2017), recently denied in part a request for a stay of a nationwide injunction in a challenge to an Executive Order that suspended entry of foreign nationals from seven countries. The Court recognized that "[c]rafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it pre-

sents." *Id*. at 2087. The Court refused to stay the nationwide injunction as to enforcement against foreign nationals who have a credible claim of a bona fide relationship with persons or entities in the United States. *Id*. at 2088. The district court in fashioning that preliminary injunction, and in weighing the equities, had focused on the concrete burdens that would fall on the particular named individuals in the case who sought injunctive relief, and reasoned that the hardships were sufficiently weighty and immediate to outweigh the Government's interest. *Id*. at 2087. The court then approved injunctions that covered not merely those individuals, but parties similarly situated to them nationwide, and the Supreme Court determined that the injunction should remain in place even as to those similarly-situated persons. *Id*. 2088.

The dissent in *Trump* raised the same objections that the Attorney General asserts in this case, but those arguments did not carry the day in *Trump* and should not do so here either. The *Trump* dissenters argued that it could have been reasonable for the Court to have left the injunctions in place as to the individuals who sought relief in the case, but that it was improper to allow the injunction to remain as to an "unidentified, unnamed group of foreign nationals abroad." *Id*. at 2090. The dissenters complained that no class had been certified, and the parties had not asked for the scope of relief provided. *Id*. Concluding that injunctive relief should be "'no more burdensome to the defendant than necessary to provide complete relief *to the plaintiffs* ' in the case," the dissenters disagreed with the determination to allow the injunction to remain in place beyond those individual plaintiffs. *Id*., quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). The Attorney General in this case also argues that injunctive re-

lief should not extend beyond that necessary to provide complete relief to the particular plaintiff—here, the City— but as *Trump* demonstrates, that limitation will not necessarily be proper where the balance of equities and the nature of the claims require broader relief. See also *Decker v. O'Donnell*, 661 F.2d 598, 618 (7th Cir. 1980) (upholding a nationwide injunction even though factfinding focused on Milwaukee County, because the case had evolved to challenging the facial constitutionality with the evidence regarding Milwaukee County merely discussed as illustration).

The district court in this case was aware of all of the concerns identified above, and in fact on its own identified and considered the articles by the commentators detailing the history of the nationwide injunction and the concerns with the use of it as a remedy. The court nevertheless held that the "equitable balance" necessitated such a remedy in this case. On appeal, we review the district court's determination as to the scope of the injunction only for an abuse of discretion. *Harlan*, 866 F.3d at 758.

The Attorney General raises three challenges to the nationwide injunction. First, the Attorney General argues that the City must seek standing as to each form of relief sought, and that it lacks standing to seek relief that benefits third parties. That argument is a non-starter. The City had standing to seek injunctive relief, and the district court had the authority to fashion the terms of that injunction as it determined necessary for the public interest in light of its determination that the City was likely to succeed on its claim that the actions violated the constitutional principles of separation of powers. *United States v. Oakland Cannabis Buyers' Co-op.*, 532 U.S. 483, 496 (2001); *Zamecnik v. Indian Prairie Sch.*

*Dist. No. 204*, 636 F.3d 874, 879 (7th Cir. 2011) ("'When the court believes the underlying right to be highly significant, it may write injunctive relief as broad as the right itself.'") quoting 1 Dan B. Dobbs, *Law of Remedies* § 2.4(6), p. 113 (2d ed.1993). Courts, including the Supreme Court recently in *Trump* as discussed above, have not found a lack of jurisdiction solely because a nationwide injunction was imposed in the absence of a class action.

The Attorney General maintains that even apart from Article III concerns, equitable principles require that the injunction be no more burdensome than necessary to provide complete relief to the City, and that the nationwide injunction exceeds that limit. Along a similar vein, the Attorney General also argues that the district court erred in conflating the scope of Chicago's legal argument with the scope of relief necessary to remedy the alleged injury, and that the City as an individual plaintiff should not obtain the equivalent of class-wide relief.

Those arguments would seek a bright-line rule that is both inconsistent with precedent and inadvisable. Essentially, the Attorney General's approach would limit nationwide injunctions to class actions, but that is inconsistent with *Trump* and the myriad cases preceding it in which courts have imposed nationwide injunctions in individual actions.

Nor should the district court be so handcuffed in determining the scope of relief that is proper. Certainly, the ability to impose a nationwide injunction is a powerful remedy that should be employed with discretion. Regardless, there are checks in the system to lessen the potential for any misuse of nationwide injunctions by the court. First, the appellate process itself operates to minimize the potential for er-

roneous or overbroad injunctions. In fairly short order, the appellate process can ensure that multiple judges review the determination, thus acting as a check on the possibility of a judge overly-willing to issue nationwide injunctions. And of course, nationwide injunctions, because of the widespread impact, are also more likely to get the attention of the Supreme Court.

Moreover, that focus on the potential shortcomings of nationwide injunctions, though proper, fails to recognize the need for such relief where the balance of equities weighs strongly in favor of such relief. Courts must be able to determine whether an action implicates the Constitution, and once a court determines that preliminary relief is required, the court must be able to engage in the "equitable balancing" to determine the relief necessary. Rarely, that will include nationwide injunctions. Granted, it is an imprecise process, but that is endemic to injunctions, and courts are capable of weighing the appropriate factors while remaining cognizant of the hazards of forum shopping and duplicative lawsuits.

The case before us presents an example of the type of case in which a district court should properly be able to apply an injunction nationwide. The case presents essentially a facial challenge to a policy applied nationwide, the balance of equities favors nationwide relief, and the format of the Byrne JAG grant itself renders individual relief ineffective to provide full relief.

First, the challenge here presents purely a narrow issue of law; it is not fact-dependent and will not vary from one locality to another. The plaintiffs have demonstrated a likelihood of success on the claim that the Attorney General lacked any Constitutional authority to impose the conditions

upon the grant recipients, and therefore that the actions violated the separation of powers principles. We are faced, then, with conditions on the receipt of critical law enforcement funds that have been imposed by the Attorney General without any authority in a manner that usurps the authority of Congress—made more egregious because Congress itself has repeatedly refused to pass bills with such restrictions. A narrow question of law such as is present here is more likely to lend itself to broader injunctive relief, and that is particularly true where the plaintiff has established a likelihood of success on a claim that the Attorney General acted *ultra vires* in imposing the conditions and those conditions apply uniformly on all grant recipients. Accordingly, this does not present the situation in which the courts will benefit from allowing the issue to percolate through additional courts and wind its way through the system in multiple independent court actions. There are some legal issues which benefit from consideration in multiple courts—such as issues as to the reasonableness of searches or the excessiveness of force—for which the context of different factual scenarios will better inform the legal principle. But a determination as to the plain meaning of a sentence in a statute is not such an issue. For that issue, the duplication of litigation will have little, if any, beneficial effect.

Moreover, the balance of equities supports the district court's determination to impose the injunction nationwide. As the *Trump* Court noted, in determining the proper scope of an injunction, the court must weigh the balance of equities, which explores the relative harms to the plaintiff and defendant as well as the interests of the public at large. *Trump*, 137 S. Ct. at 2087. The district court properly assessed that balance of harms here. The harm to the Attorney Gen-

eral is minimized because the Attorney General can distribute the funds without mandating the conditions—as has been done for over a decade—and nothing in the injunction prevents any state or local government from coordinating its local law enforcement with the federal authorities and complying with the conditions sought here. And we have seen that even objecting governments such as the City willingly cooperate with federal authorities as to those individuals who commit serious offenses. The adverse impact to the Attorney General is limited to those jurisdictions who oppose the conditions, which presumably would be the jurisdictions that would join in pursuing the multiplicitous cases that would be needed to obtain the relief provided here, or which would not have the means to pursue such litigation and would face the choice of complying with the apparently-unconstitutional conditions or losing crucial law enforcement funds. On the other hand, the impact on localities forced to comply with these provisions could be devastating. Those local and state governments have concluded that the safety of their communities is furthered by a relationship of trust with the undocumented persons and lawful immigrants residing therein—and those localities are clearly in the best position to determine the security needs of their own communities. Such trust, once destroyed by the mandated cooperation and communication with the federal immigration authorities, would not easily be restored. And given the significance of the federal funds at issue, amounting to hundreds of thousands to millions of dollars for each state, noncompliance is a particularly poor option.

Moreover, the public interest, which is also a factor in the balance of equities, see *Trump*, 137 S. Ct. at 2087, weighs in favor of the nationwide injunction. The public interest

would be ill-served here by requiring simultaneous litigation of this narrow question of law in countless jurisdictions. And it is clear from the nature of the claim and the response of amici in this case that litigation on this matter would indeed be widespread and simultaneous. First, the actions would have to be brought swiftly in each jurisdiction, because the conditions are imposed by the Attorney General in the award of the grant itself, and therefore the window for challenging the conditions is limited to the 45-day period between the award of the grant and the deadline for accepting or rejecting that award. This is not a situation in which courts would be able to benefit from perusing the decisions of other courts in the matter.

And it is clear that a significant number of award recipients oppose the conditions and would challenge the conditions if financially able to do so. Among the amici asking the district court to uphold the injunction in the stay proceedings were 37 cities and counties. In fact, while the motion to stay was pending in the district court, the United States Conference of Mayors, representing the interests of 1,400 cities nationwide, including many Byrne JAG grant applicants, moved to intervene, but that motion was denied in part because the nationwide injunction was sufficient to protect the interests of its members. Moreover, 14 states and the District of Columbia filed an amicus brief in this court also arguing for affirmance of the nationwide injunction, thus further exhibiting the likelihood of widespread, duplicative litigation in the absence of such relief. The district court appropriately held that judicial economy counseled against requiring all of those jurisdictions, and potentially others, from filing individual lawsuits to decide anew the narrow legal question in this case.

Finally, the structure of the Byrne JAG program itself supports the district court's determination to impose a nationwide injunction because the recipients of the grant are interconnected. Funding under the statute is allocated among states and localities from one pool based on a strict formula. The states and cities seeking grants under the Byrne JAG program are not islands, in which actions as to one are without impact on others. The conditions imposed on one can impact the amounts received by others. For instance, the amounts allocated under the Byrne JAG program can vary based on the participation of the states and localities, and the distribution structure includes explicit provisions for reallocation of funds in some circumstances—such as to units of local government if the State is unable to qualify to receive funds or chooses not to participate. 34 U.S.C. § 10156(f). Furthermore, funds allocated to Byrne JAG recipients can be withheld as a penalty for non-compliance with other statutory requirements, and those funds are then reallocated to other, compliant, Byrne JAG recipients. See e.g. 34 U.S.C. § 20927, § 30307(e). The City further points out that under its provisions, the City is obligated to apply for Byrne JAG funds not only for itself but for eleven neighboring localities. Thus, the recipients of Byrne JAG funding are interconnected and an impact to one recipient can have a ripple effect on others. Under such a formula grant in which the states and local governments are intertwined, and where the conditions imposed preclude all funding to those who refuse to comply, piecemeal relief is ineffective to redress the injury, and only nationwide relief can provide proper and complete relief. In sum, this is an instance in which the court could, and did in the exercise of its discretion, appropriately enter a nationwide injunction.

Our review here is a narrow one. We can reverse only if the Attorney General has established that the district court abused its discretion in determining that the scope of the injunction should be nationwide. Judge Leinenweber in this case set forth his thoughtful consideration of the appropriate factors in the decision below denying the stay, and given the purely legal nature of the issue here, the broad and uniform impact on all grant recipients, the minimal harm to the Attorney General given the continued ability for voluntary cooperation, and the structure of the Byrne JAG statute that interconnects those grant recipients, we conclude that the court did not abuse its discretion here.

## V.

Accordingly, the district court did not err in determining that the City established a likelihood of success on the merits of its contention that the Attorney General lacked the authority to impose the notice and access conditions on receipt of the Byrne JAG grants, and did not abuse its discretion in granting the nationwide preliminary injunction in this case. The decision of the district court is AFFIRMED.

MANION, *Circuit Judge*, concurring in the judgment in part and dissenting in part. Unless done for a purpose "unrelated to the enforcement of a civil immigration law," the City of Chicago forbids its agencies or agents to

> (A) permit ICE [Immigration and Customs Enforcement] agents access to a person being detained by, or in the custody of, the agency or agent; (B) permit ICE agents use of agency facilities for investigative interviews or other investigative purpose; or (C) while on duty, expend their time responding to ICE inquiries or communicating with ICE regarding a person's custody status or release date.

Chicago, Ill., Muni. Code § 2-173-042(b)(1). This ordinance's proscription on cooperation does not apply if the subject of the investigation falls within at least one of four excepted classes of persons: those with outstanding criminal warrants, felons, those with a felony charge pending, and known gang members. *Id.* at § 2-173-042(c). For Chicago, this ordinance barring collaboration with federal immigration authorities is important to maintaining its image as a "Welcoming City," open to aliens both documented and undocumented. It considers it an expression of its independent sovereignty that it can choose not to assist the federal government in enforcing the nation's immigration laws. For the Attorney General, the ordinance is an obstacle to effective law enforcement. His interest is in getting deportable criminal aliens off the streets, and he believes Chicago's policies endanger the community.

This debate casts a long shadow over this appeal, but ultimately these broad questions touching on immigration policy and federal/local cooperation in law enforcement are not

at issue in this case. Instead, this is a case about federal funds and who gets to decide the terms by which those funds are distributed.

Since 2006, the federal government has given money to local governments for law enforcement purposes through the Byrne JAG program. For Fiscal Year 2017, the Attorney General wants to impose immigration-related conditions on the receipt of those funds. Specifically, the Attorney General wants Byrne JAG recipients to provide federal immigration agents with notice of the release dates of certain aliens in their custody (the "Notice" condition); provide immigration agents with access to facilities to conduct interviews with certain detainees (the "Access" condition); and provide a certification of compliance with 8 U.S.C. § 1373, which bars governments from prohibiting their officials "from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, of any individual" (the "Compliance" condition).

Because of its commitment to being a "Welcoming City,"[1] Chicago does not want to comply with these conditions. But it still wants to receive its Byrne JAG allotment, so it filed this lawsuit against the Attorney General seeking to prevent

---

[1] As the court notes, Chicago uses the term "Welcoming City," but its policies place it in the same camp as other so-called "sanctuary cities." Maj. Op. at 10–11. The court calls this a misnomer: those cities do not "interfere in any way with the federal government's lawful pursuit of its civil immigration activities." *Id.* at 11. Whether and to what extent such "sanctuary" policies constitute passive non-cooperation or active interference is the subject of other litigation. *See United States v. California*, No. 18-264 (E.D. Cal. filed Mar. 6, 2018).

him from enforcing these conditions. The case is before us on appeal from a grant of a preliminary injunction forbidding the Attorney General from enforcing the Notice and Access conditions. The Compliance condition is not at issue in this appeal.

To get a preliminary injunction, a plaintiff like Chicago must show "that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter v. Nat'l Res. Defense Council, Inc.*, 555 U.S. 7, 20 (2008). The district court decided a preliminary injunction was appropriate. It concluded that Chicago was likely to succeed on the merits because the Attorney General lacks the authority to impose the Notice and Access conditions and that Chicago would suffer irreparable harm without an injunction. The court determined that the balance of the equities and the public interest "favor neither party." *City of Chicago v. Sessions*, 264 F. Supp. 3d 933, 951 (N.D. Ill. 2017).

On appeal, the Attorney General only challenges one aspect of the district court's reasoning for entering an injunction: he argues he does have the authority to impose the Notice and Access conditions.[2] The court today says he does

---

[2] Surprisingly, the Attorney General does not challenge any other detail of the district court's reasoning, even though the district court appears to have misapplied *Winter*. The district court treated the four requirements of the *Winter* test as factors to be weighed rather than elements to be met. Thus, even though the district court specifically concluded the balance of the equities and the public interest did not favor Chicago, it still entered an injunction. Because Chicago did not meet all four elements as laid out in *Winter*, it seems the district court should not have entered an injunction. *See Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d

not, and I agree. As that is all the Attorney General challenges about the district court's reasoning, I concur in the court's judgment that the decision to enter an injunction protecting Chicago was not an abuse of discretion.

However, the court today also concludes that it was within the district court's discretion to impose that injunction nationwide. Because I believe the entry of the nationwide injunction constituted an overstep of the district court's authority, I dissent from that portion of the court's decision.

## I.

The Notice and Access conditions, viewed in isolation, are perfectly reasonable. No one should find it surprising that the federal government would require cooperation with its law enforcement efforts in exchange for the receipt of federal law enforcement funds. Indeed, the Attorney General's obvious frustration at applicants for Byrne JAG funds who "insist on their entitlement to federal law enforcement grants even as they refuse to provide the most basic cooperation in immigration enforcement" is eminently understandable. Appellant's Brief at 17. But the reasonableness and soundness of the conditions are not at issue here. Courts do not (or at least should not) decide legal issues based on the courts' impression of the propriety of particular policies. Conse-

---

342, 347 (4th Cir. 2009) ("*Winter* articulates four requirements, each of which must be satisfied as articulated…."), *judgment vacated on other grounds by* 559 U.S. 1089 (2010). Nevertheless, because the Attorney General has not challenged this aspect of the district court's order, he has waived it as a grounds for reversal. *See Hojnacki v. Klein-Acosta*, 285 F.3d 544, 549 (7th Cir. 2002) ("A party waives any argument that it does not raise before the district court or, if raised in the district court, it fails to develop on appeal.").

quently, the debates over how much the states should be involved in enforcing immigration policy should not distract from the issues within the court's purview to resolve.

Because this case deals with the awarding of a federal grant, it necessarily concerns the spending of federal money. The Constitution places the power to spend federal money in the legislative branch. *See* U.S. Const. art. I, § 8, cl. 1 ("The Congress shall have Power…to pay the Debts and provide for the…general Welfare of the United States…."); *see also Nat'l Federation of Indep. Bus. v. Sebelius*, 567 U.S. 519, 576 (2012) ("We have long recognized that Congress may use [the Spending Clause] power to grant federal funds to the states and determining priority purposes for formula grants."). With this power comes the ancillary authority to place conditions on the receipt of federal funds. *Nat'l Federation of Indep. Bus.*, 567 U.S. at 576. Accordingly, there is no inherent executive authority to place conditions on the receipt of federal funds—any such authority must be given to the executive by the legislature. *See generally La. Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 374 (1986) ("[A]n agency literally has no power to act…unless and until Congress confers power upon it.").

Recognizing this, the Attorney General directs us to 34 U.S.C. § 10102(a)(6), which states that the Assistant Attorney General for the Office of Justice Programs, which oversees the Byrne JAG program, shall "exercise such other powers and functions as may be vested in the Assistant Attorney General pursuant to this chapter or by delegation of the Attorney General, *including placing special conditions on all grants*…." 34 U.S.C. § 10102(a)(6) (emphasis added). The Attorney General argues this is a broad-sweeping grant of au-

thority to impose any conditions on any grants, the only limit being the Constitution itself. I agree with the court that this is not so.

Therefore, because I agree that the Attorney General does not have the authority to impose the Notice and Access conditions, and because that is all the Attorney General challenges concerning the propriety of an injunction, I concur in the judgment of the court affirming the entry of a preliminary injunction prohibiting the Attorney General from imposing those conditions on Chicago. [3]

## II.

But a simple preliminary injunction protecting Chicago (the only plaintiff in this suit) is not all the district court entered. Instead, the district court announced as follows: "This injunction against imposition of the notice and access conditions is nationwide in scope, there being no reason to think that the legal issues present in this case are restricted to Chicago or that the statutory authority given to the Attorney

---

[3] The Attorney General does not have authority to force Chicago to cooperate with federal immigration-enforcement efforts as a condition to receiving Byrne JAG funds. But that does not mean that such cooperation is not allowed. Indeed, based on the exceptions in Chicago's ordinance, Chicago itself has concluded that cooperation with the federal government concerning certain classes of alien is to its benefit. I assume and expect that, for example, when Chicago finds itself with custody over a deportable alien who was convicted of a felony, members of various law enforcement agencies in Chicago are free to work with ICE and provide notice of release and access to that alien. The Attorney General cannot force that cooperation as a condition of receiving funds, but it is likely there are a number of Chicago police officers and other officials who are ready, willing, and able to work with ICE agents in such situations, and they are free to do so.

General would differ in another jurisdiction." *City of Chicago*, 264 F. Supp. 3d at 951.

This was a gratuitous application of an extreme remedy. This court now upholds the district court's overreach because "[t]he case presents essentially a facial challenge to a policy applied nationwide, the balance of equities favors nationwide relief, and the format of the Byrne JAG grant itself renders individual relief ineffective to provide full relief." Maj. Op. at 30. In doing so, the court bypasses Supreme Court precedent, disregards what the district court actually concluded concerning the equities in this case, and misreads the effect of providing relief to Chicago only.

A. *United States v. Mendoza*

First, the court says a nationwide injunction was appropriate in this case because it "presents purely a narrow issue of law… [that] will not vary from one locality to another." Maj. Op. at 30. This reasoning is contrary to Supreme Court precedent.

A nationwide injunction is similar in effect to nonmutual offensive collateral estoppel, which "occurs when the plaintiff seeks to foreclose the defendant from litigating an issue the defendant has previously litigated unsuccessfully in an action with another party." *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 n.4 (1979). In *United States v. Mendoza*, 464 U.S. 154 (1984), the Supreme Court held that "nonmutual offensive collateral estoppel…does not apply against the Government in such a way as to preclude relitigation of issues." *Id.* at 162. The Court did so primarily because "allowing nonmutual collateral estoppel against the Government…would substantially thwart the development of im-

portant questions of law by freezing the first final decision rendered on a particular legal issue." *Id.* at 160. Additionally, it noted that "[a]llowing only one final adjudication would deprive [the] Court of the benefit it receives from permitting several courts of appeals to explore a difficult question before [the] Court grants certiorari." *Id.* As the Fourth and Ninth Circuits have both recognized, these concerns are just as present in the context of nationwide injunctions. *See L.A. Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 664 (9th Cir. 2011); *Va. Soc'y for Human Life, Inc. v. Fed. Election Comm'n*, 263 F.3d 379, 393 (4th Cir. 2001), *overruled on other grounds by The Real Truth About Abortion, Inc. v. Fed. Election Comm'n*, 681 F.3d 544 (4th Cir. 2012).

Though the court does not cite *Mendoza* in its opinion today, it implicitly attempts to distinguish that decision. It says that this case "does not present the situation in which courts will benefit from allowing the issue to percolate through additional courts and wind its way through the system in multiple independent court actions." Maj. Op. at 31. It claims this case is different from ones involving issues "for which the context of different factual scenarios will better inform the legal principle." *Id.* But if a lack of factual differentiation is all that is needed to distinguish *Mendoza*, then a nationwide injunction is appropriate in every statutory-interpretation case. That cannot be the law. If anything, the opposite is true. Different parties litigating the same issues in different forums will likely engage different arguments, leading to diverse analyses and enhancing the likelihood of the strongest arguments coming to the fore. Courts faced with difficult statutory questions are the ones who benefit the most from the existence of multiple well-reasoned decisions from which to draw.

*Virginia Society for Human Life* is illustrative. In that case, the Fourth Circuit was faced with deciding the constitutionality of a federal regulation, "a 'purely legal' issue [for which] further factual development will not assist…in [the] resolution." *Va. Society for Human Life, Inc.*, 263 F.3d at 390 (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967)). Nevertheless, the Fourth Circuit concluded that a nationwide injunction would have "the effect of precluding other circuits from ruling on the constitutionality of" the regulation, thus "conflict[ing] with the principle that a federal court of appeals's decision is only binding within its circuit." *Id.* at 393. The court recognized that to uphold the injunction would be to impose its "view of the law on all the other circuits." *Id.* at 394. That the underlying issue was purely legal did not alter that fact.

The district court's order in this case, and this court's decision to affirm it, directly conflict with these principles. We are not the Supreme Court, and we should not presume to decide legal issues for the whole country, even if they are purely facial challenges involving statutory interpretation. While we may be convinced that the statute says one thing, we should not discount the fact that our honorable colleagues in other districts and other circuits may view things differently. Just as we can disagree with them, they can disagree with us. *See, e.g.*, *Atchison, Topeka and Santa Fe Ry. Co. v. Peña*, 44 F.3d 437, 443 (7th Cir. 1994) (en banc) ("[W]hile we carefully consider the opinions of our sister circuits, we certainly do not defer to them.").

B. Equities

The court's opinion also says the balance of the equities weighs in favor of a nationwide injunction. Essentially, the court concludes it would have no serious impact on the Attorney General to distribute the money absent these conditions. But if the conditions are imposed, jurisdictions like Chicago who do not want to comply will be denied their federal funds or will be forced to sacrifice the trust of their (undocumented) immigrant communities.

On this point, there is no basis to second-guess the reasoning of the district court, which expressly determined that the balance of the equities and the public interest "favor neither party." *City of Chicago*, 264 F. Supp. 3d at 951. The district court acknowledged Chicago's purported interest in "the benefits that flow from immigrant communities freely reporting crimes and acting as witnesses," but it also recognized the Attorney General's "need to enforce federal immigration law." *Id.* The district court explained that "[b]oth sides can claim that concerns of public safety justify their positions" and that "[b]oth parties have strong public policy arguments, the wisdom of which is not for the Court to decide." *Id.* So equity weighs on both sides, and it certainly does not justify the entry of a nationwide injunction. Indeed, as alluded to in note 2, *supra*, a court in the Fourth Circuit would likely not even have entered a more limited injunction when the equities were so evenly balanced. *See Real Truth About Obama, Inc.*, 575 F.3d at 347. If an injunction is going to be nationwide, it should at least be one that could have been entered anywhere in the nation.

The court also suggests that avoiding "widespread, duplicative litigation in the absence of" a nationwide injunction

is in the public interest. Maj. Op. at 33. But a nationwide injunction is not the only way, nor even the best way, to avoid this problem. Chicago could have filed a class action pursuant to Rule 23(b)(2) seeking declaratory and injunctive relief on behalf of all jurisdictions that do not want to comply with the conditions. *See* Fed. R. Civ. P. 23(b) ("A class action may be maintained if Rule 23(a) is satisfied and if:…(2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive or declaratory relief is appropriate respecting the class as a whole…."). Requiring a class action has the benefit of dealing with the one-way-ratchet nature of the nationwide injunction. A nationwide injunction ties the Attorney General's hands when he loses, but if Chicago had lost here, then some other municipality could have filed suit against the Attorney General in some other jurisdiction, and that process could in theory continue until a plaintiff finally prevailed. With a class action, a decision would bind those other municipalities just as it would bind the Attorney General, and they could not run off to the 93 other districts for more bites at the apple.

C. The Byrne JAG Statute

The court's final reason for upholding the nationwide injunction is that the nature of the Byrne JAG program requires it. Byrne JAG is a formula grant, meaning "allocations of money to states or their subdivisions are in accordance with a scheme prescribed by law or by administrative regulation." Federal Grant Practice § 16:5 (2017 ed.). The Byrne JAG formula provides that of the money appropriated by Congress, 50% goes to the states based on population and 50% goes to the states based on violent crime statistics. 34

U.S.C. § 10156(a)(1). Of the amount allotted to each state, 40% goes to local governments. *Id.* at (b)(2). If a jurisdiction fails to comply with certain statutory requirements, the funds can be withheld and redistributed. *See* 34 U.S.C. §§ 20927, 30307. The court notes that these and other considerations suggest that "an impact to one recipient can have a ripple effect on others." Maj. Op. at 34.

This argument is not sufficient to justify a nationwide injunction. It is axiomatic that the extraordinary relief of an injunction "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). This means that broad relief, even relief that benefits non-parties, is sometimes necessary to provide complete relief to the actual plaintiffs. The classic examples of such scenarios are desegregation cases. *See, e.g., Bailey v. Patterson*, 323 F.2d 201, 206 (5th Cir. 1963). In those cases, the plaintiffs did "not seek the right to use those parts of segregated facilities that have been set aside for use by 'whites only.'" *Id.* Rather, "they [sought] the right to use facilities which have been desegregated…." *Id.* Accordingly, "[t]he very nature of the rights [the plaintiffs] [sought] to vindicate require[d] that the decree run to the benefit not only of [the plaintiffs] but also for all persons similarly situated." *Id.* In the same vein, cases suggesting ubiquitous harm, such as federal violations of the Establishment Clause, could also justify a nationwide injunction, because an establishment of religion by the federal government would harm the plaintiffs wherever it was taking place. *See generally Decker v. O'Donnell*, 661 F.2d 598, 618 (7th Cir. 1980). In those cases, the relief to non-parties could be called a side-effect of the relief given to the plaintiffs.

This was the case in *International Refugee Assistance Project v. Trump*, 857 F.3d 554 (4th Cir. 2017). There, the Fourth Circuit upheld a nationwide injunction on the President's "travel ban" because the plaintiffs were "dispersed throughout the United States," there was an interest in ensuring uniform application of immigration laws, and the court concluded the ban "likely violates the Establishment Clause." *Id.* at 605; *see also Hawaii v. Trump*, 859 F.3d 741, 787–88 (9th Cir. 2017). Without directly addressing the merits of why the injunction should be nationwide, the Supreme Court declined to completely stay the injunction. *See Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2089 (2017).

The same need to protect third parties to provide complete relief is not present here. The structure of the Byrne JAG program does not require granting relief to non-parties. While the statute does provide situations in which money would be withheld and redistributed, there are no provisions for redistribution of funds withheld for failing to abide by the Attorney General's "special conditions."[4] The formula provides for the calculation of allotments, and then those allotments are claimed by grantees submitting applications. Apart from instructing that money withheld from a state should be redistributed to its local governments, 34 U.S.C. § 10156(f), the statute is completely silent on what happens if a potential grantee is denied or if it simply fails to submit an application. Chicago has not shown how that situation would resolve itself, and it has certainly not shown how an

---

[4] This may be further indication the Attorney General does not have the broad conditioning authority he claims he does, and underscores the need for Congress to intervene to fill in any blanks the Attorney General, or any other litigant, deems necessary.

injunction preventing the Attorney General from enforcing the conditions at all is necessary to protect its own interest in collecting its allotment. If money were withheld and redistributed from other jurisdictions, Chicago would *benefit* by getting more money. Finally, this case is tangentially related to immigration law and policy, but it is ultimately a funding case, and it does not come close to implicating the nationwide uniformity concerns raised in other cases. The nationwide injunction is simply unnecessary here.

### III.

Given the conclusion that Chicago has a likelihood to prevail on the merits in this case, and the fact that the Attorney General has not challenged any other aspect of the district court's preliminary-injunction analysis, I join the court's judgment affirming the entry of the injunction. I do so, however, only for an injunction that protects Chicago. Other jurisdictions that do not want to comply with the Notice and Access conditions were not parties to this suit, and there is no need to protect them in order to protect Chicago. An injunction, particularly a preliminary injunction, is an extreme remedy. A nationwide preliminary injunction is more extreme still. One should only be issued where it is absolutely necessary, and it is far from absolutely necessary here. Consequently, I would remand with instructions to the district court to modify the injunction so as to prevent the Attorney General from enforcing the conditions only concerning Chicago's application for funds.